WESLEY MILES v. THE STATE.

No. 4696.   Decided January 16, 1918.

**1.—Murder—Bills of Exception—Misconduct of Jury.**

Bills of exception preserving facts relating to testimony heard on motion
for new trial must be filed during the term of court, otherwise they will not
be considered on appeal. Following Black v. State, 41 Texas Crim. Rep., 185.

**2.—Same—Statement of Facts—Precedent.**

Where the assistant attorney general moved to strike out the statement of
facts, but the same was similar to one which the court considered on appeal, the
motion to strike out is overrruled. Following Serop v. State, 69 Texas Crim.
Rep., 399.

**3.—Same—Murder—Manslaughter.**

Where, upon trial of murder, the court charged the jury on murder, self-
defense, manslaughter, aggravated and simple assault, and appellant insisted
that the issue of murder should not have been submitted, and the record on
appeal showed that the homicide was in a sudden quarrel, under circumstances
sufficient to show adequate cause and to produce a state of mind, such as to re-
duce the homicide to manslaughter, held, that the issue of murder should not
have been submitted. Prendergast, Judge, dissenting.

Appeal from the District Court of McLennan. Tried below before
the Hon. Richard I. Munroe.

Appeal from a conviction of murder; penalty, twenty years imprison-
ment in the penitentiary.

The opinion states the case.

No brief on file for appellant.

*E. B. Hendricks,* Assistant Attorney General, for the State.—On ques-
tion of bills of exception: Bailey v. State, 65 Texas Crim. Rep., 1,
144 S. W. Rep., 996; Treadway v. State, 65 Texas Crim. Rep., 208,
144 S. W. Rep., 655; Kinney v. State, 67 Texas Crim. Rep., 175, 148
S. W. Rep., 783.

On question of filing statement of facts: Nolen v. State, 72 Texas
Crim. Rep., 450; Sandifer v. State, 63 id., 361; Campbell v. State,
65 Texas Crim. Rep., 418, 144 S. W. Rep., 966.

MORROW, Judge.—Appellant's conviction was for murder and his punishment assessed at twenty years confinement in the penitentiary.

The indictment appears regular. There are two bills of exception complaining of misconduct of the jury. The Assistant Attorney General insists that these bills can not be considered by the court for the reason that they were not filed during the term at which the case was tried. It appears the term ended on the 2nd day of June, 1917, and that the bills were filed on July 26, 1917. That bills of exception preserving facts relating to testimony heard on the motion for new trial must be filed during the term has been frequently held by this court. Black v. State, 41 Texas Crim. Rep., 185, and cases listed in Vernon's C. C. P., p. 833, note 5. This established rule renders it imperative that bills mentioned under the circumstances be disregarded.

The Assistant Attorney General also objects to the consideration of the statement of facts, and moves to strike it out on the ground that it does not purport to be a correct statement of facts, nor one prepared by the court upon the disagreement of the parties. In form it is an agreed statement, but is signed by the attorneys for the appellant only. Attached to it is the following certificate: "The above examined, found correct, approved and ordered filed as a statement of facts in this cause, this the 30th day of July, A. D. 1917," signed by the presiding judge. Before the signature of appellant's attorneys is the usual written agreement that the statement of facts contains a correct statement of all the evidence. The case of Serop v. State, 69 Texas Crim. Rep., 399, 154 S. W. Rep., 557, is one in which a statement of facts similar in all respects to the one in question was held sufficient. The presiding judge, having been given by statute the authority and charged with the duty of making up a statement of facts on disagreement of the parties, his signature and certificate attached to the instrument filed as a statement of facts would be presumed to have been made under authority of the statute. In the case mentioned several decisions of this court are cited supporting it. We, therefore, are of the opinion that we are under obligation to consider the statement of facts.

The court charged the jury on murder, self-defense, manslaughter, aggravated and simple assault. Appellant insists that the issue of murder should not have been submitted because not raised by the evidence. This contention is made both in exceptions to the charge at the time and in the motion for a new trial.

Both the deceased and the appellant were negroes. The homicide took place in a saloon at West, McLennan County, Texas. Deceased was struck by appellant one time with a pocketknife, penetrating the jugular vein, and after receiving the wound deceased went out of the saloon and walked on the street about two hundred yards, and died about an hour later. There were six or seven eyewitnesses. The deceased was somewhat under the influence of intoxicating liquor but not drunk. Appellant and several other negroes were in the barroom han-

MILES v. THE STATE.

dling a puzzle to determine which should pay for the drinks. Appellant had the puzzle in his hands. While he and the others were thus en-. gaged the deceased, who was not a member of the party, came into the saloon and began a conversation, and the difficulty resulting in the homicide followed in a very short time.

One of the eyewitnesses who was introduced by the State said: "Wesley Miles and five or six other negroes were standing in the saloon near the negro bar. I was standing back of the bar, and defendant and his asociates were working out a puzzle to see who would buy the drinks. Wesley Miles had the puzzle and was working on it when Earnes Higgens walked into the saloon. Deceased stopped about ten feet from where the defendant and the others were standing, and addressd himself at me, asking me to lend him a mandolin. I told him. I had none. He said, 'You are a damned liar, you have.' I told him that I had a guitar but did not have a mandolin. He was drinking some but did not seem to be drunk. He then turned and walked down to where the defendant and his associates were standing and said, 'What are you damned niggers doing down here?' He walked up to defendant, who said, 'You don't know me.' Deceased remarked, 'No, you don't know me either.' Wesley Miles then walked from where he was standing to the front end of the negro bar, and leaned up against the bar with his elbows on it. Deceased walked towards him, making the remark, 'I am going to have to kill some of these God damned West niggers before night.' At the time of this remark deceased put his hand in his pocket and walked towards Miles. Deceased was in a rowdy and rough mood. Loveless Williams then walked up to them and remarked, 'You niggers cut this out, and caught hold of Miles' wrist while Miles was still standing against the bar. Williams dropped Miles' hand and he struck a back hand lick which struck deceased on the neck. Deceased immediately turned and went out of the front door. Defendant turned to us and remarked that he might come back again, and walked through the back door, a distance of about twenty feet. Deceased was dodging around Loveless Williams and appeared to be trying to get to the defendant. Deceased appeared to be mad and excited. The knife was a small pocketknife with a blade about two and one-half or three inches long and had only one handle."

Another State's witness, Loveless Williams, said that he was with deceased at another saloon shortly before the homicide, and followed him, and as witness was entering the back door of the place where the difficulty took place he noticed the parties in an argument but did not hear what was said. Appellant was standing with his back to the bar with his elbows resting on it. The deceased was about two steps in front of him facing him. Miles had a pocketknife with the blade in his right hand. "I remarked to them, 'You niggers cut out this fussing,' and then caught hold of the wrist of the defendant in which hand he held the knife. The defendant made no resistance or effort to release his arm or get to the deceased. From all appearances I thought

the difficulty was over. I turned his wrist loose and his arm dropped to his side, and kind of grinned, and deceased looked out the front door. Almost immediately the defendant raised his arm parallel with his shoulder and struck the deceased with a back hand lick in the right side of the neck. I never saw deceased make any movement towards Miles. Without moving from his position the defendant made the statement, 'Let him go, I got the son-of-a-bitch,' and he looked at his knife, which was about two and one-half or three inches long."

Another witness describes the position of the parties substantially as above, and said: "About this time Loveless Williams walked between defendant and deceased and caught hold of defendant's hand and remarked, 'Don't you boys have any trouble.' Defendant then dropped his hand and had his knife up his sleeve and turned his back to the bar and defendant raised his arm parallel to his shoulder and struck deceased a back handed blow in the right side of the neck with a pocketknife which he had in his hand. Defendant said, 'I got the son-of-a-bitch,' and I looked at the knife and it had blood on it. I do not know whether or not the deceased had a knife. I did not see him with a knife, and I did not see the defendant open his knife. He did not move from his position at the bar to attack deceased."

Another eyewitness introduced by the defendant describes the occurrence substantially as that related by the first witness for the State up to the time the conversation began. We quote from his testimony as follows: "Deceased walked up and remarked, 'What are you damned niggers doing back here?' Defendant answered, 'You don't know me.' Deceased replied, 'You don't know me either.' He then ran his hand down in his pocket and defendant ran his hand in his pocket. Prior thereto deceased said, 'I bet I have to kill some of these little West niggers before night.' Williams walked between them and caught defendant's hand and said, 'Don't you boys have any trouble in here.' Defendant was standing up with his elbows on the bar. He didn't say anything but let his hand drop to his side, and immediately thereafter raised his hand and struck a back handed blow in the right of the deceased's neck with the pocketknife he had in his hand."

An officer testified for the State that he went to the scene of the difficulty, found appellant, who made no resistance to arrest. He searched the clothing of the deceased by patting on the pockets with his hands and did not find any weapon or knife. Quite a crowd had congregated and if he had any weapon it could have been moved without the witness' knowledge. Deceased wore two pairs of trousers, and he states he did not place his hands in the pockets of the under trousers.

Another witness for the defendant testified that she was present when deceased was brought into the restaurant where he died, and that the next morning she found his trousers covered with blood where they had been thrown in a barrel, and found in the pocket thereof a knife.

Appellant testified that he was twenty-five years of age, and was a

farm laborer; that he was in the saloon with several friends, and was
standing close to the bar in the back of the saloon working a puzzle,
and deceased walked into the saloon and stopped and had a conver-
sation with Frank Totten about thirty feet of him. The nature of the
conversation appellant did not know. The deceased then walked to
appellant and the party with him and remarked, "What are you niggers
doing back here?" and tried to take the puzzle from appellant's hand,
and appellant remarked, "You do not know me." Deceased then re-
marked, "No, you don't know me either." Appellant said, "I then
walked up there to the front of the negro bar near the ice box and
leaned up against the bar with my elbows on the bar. I then opened
my knife and stood there with my back to the bar. I made no effort
to advance toward the deceased. I opened my knife because I thought
that he was looking for trouble and appeared to be very angry. I did
not open my knife with any idea of hurting him unless it was necessary
to defend myself. I did not curse the deceased or give him any cause
to attack me. About the time I got my knife out he thrust his hand
down in his pocket and remarked as he started toward me, 'I am going
to kill some of the God damned West niggers before night.' Loveless
Williams stepped between us and pushed him back and then caught
hold of my arm, the one in which I held my knife. I did not offer
any resistance, and when Loveless Williams said, 'You niggers don't
have any trouble in here boys,' I thought the deceased had cooled down.
I let my hand fall limply to my side and Loveless Williams turned
loose my hand. The deceased immediately came back towards me. He
advanced close enough for me to strike him without moving out of
my tracks. He appeared to be very mad and excited and I thought
my knife would stop him. I raised my arm parallel with my shoulder
and struck a back handed stab at him. I did not think that I was
cutting him and I thought by doing this I could stop him from ad-
vancing on me. I was scared and excited and he kept advancing on
me. I did not aim at his jugular vein. I did not have any intention
of killing him. I thought he was about to draw his knife. I could
see the handle of his knife as he was trying to get it out of his pocket.
When I cut him he left. He did not say or do anything to indicate
that he was very badly hurt. I did not attempt to follow him, but
remarked to my friends that I thought he would come back. When he
made the remark that he was going to kill some West nigger before
night I thought he meant me, and when he put his hand in his pocket
and looked angrily at me, gritting his teeth, I thought he was about to
execute his threats. He was a much larger man than I and had the
reputation of being a bad negro. The knife that I used was a small
size pocketknife with a blade two or three inches long and had a broken
handle. They were crowding around me in the bar and I had my back
to the bar and I could not retreat or move from my position. I would
have run if it had been possible to do so without increasing the danger

to which I was exposed. If I killed the deceased I did not intend to do so, and whatever I did, I did it because I thought the deceased was about to execute his deadly threat against my life and that the danger was imminent. I acted as I did because I could not protect myself in any other way. I went out of the saloon because I thought he might come back. I had had no previous trouble with deceased."

We believe the trial court should have granted appellant a new trial. Viewing the matter from the standpoint of appellant, deceased had the reputation of a bad negro; he was under the influence of liquor. In the language of the State's witness deceased was in a rowdy and rough mood. By the undisputed evidence it is shown he accosted appellant, and when appellant sought to avoid him by changing his position and going to the other end of the bar, he was followed by the deceased with the remark, "I am going to kill some of the God damned West niggers before night." He put his hand in his pocket and walked toward appellant at the time he made this remark. There were seven eyewitnesses according to the testimony of the State's witness Williams. Appellant testified at the time he struck deceased he, appellant, was back up against the counter and deceased was attacking him; that after Williams had undertaken to separate them deceased came back at him, and was so close to him that he struck him without moving from his position. The fact that appellant did not pursue him and struck a back handed blow without moving his position is corroborated by several of the witnesses and not contradicted by any of them. The fact that deceased was attacking or making a demonstration to attack appellant at the time the lick was struck, is not denied by any of the seven eyewitnesses. Some of them say they did not see the deceased make any demonstration, but none of them contradict appellant's testimony that he did. Appellant struck with one blow, and with a weapon which is not a deadly weapon per se, and being such was not one from which the intent to kill would be presumed. See art. 1147, P. C. Appellant denied such intent. There was no antecedent grudge or threats on the part of appellant. The homicide was in a sudden quarrel, under circumstances sufficient to show adequate cause and produce a state of mind such as to reduce the homicide to manslaughter. If there is evidence raising the grade of homicide above the degree of manslaughter, it consists in the remark attributed to appellant after the blow was struck and the conclusion of one of the State's witnesses that appellant's knife was up his sleeve when his arm fell down. The evidence of the State's witnesses is conflicting in regard to these circumstances, and neither of them is inconsistent with manslaughter or self-defense.

The judgment of the lower court is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, Judge (dissenting).—I think the evidence was sufficient to establish murder. Manslaughter was properly submitted, as well as aggravated and simple assault, and self-defense. A fair and

impartial jury of twelve men and the judge who heard all the evidence found him guilty of murder.    Their verdict should stand.    I can not consent to a reversal.